**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

**Filed *In Camera* and Under Seal**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. JAMES P. McGINNIS, | : : : | |
| Plaintiff, | : : | Case No. |
| v. | : : | JURY TRIAL DEMANDED |
| DYNCORP INTERNATIONAL INC., AND DYNCORP INTERNATIONAL LLC, | : : : : | |
| Defendant. | : : | |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE**
***QUI TAM* PROVISION OF THE FEDERAL FALSE CLAIMS ACT**

**I.     JURISDICTION AND VENUE.**

1.     This is an action to recover damages, civil penalties, and other relief on behalf of the United States of America arising from Defendants DynCorp International Inc.'s and DynCorp International LLC's conduct in filing and causing the filing of false claims for payment under its contract with the Department of Defense known as Logistics Civil Augmentation Program (LOGCAP) IV.  In general, DynCorp falsely and fraudulently told the Department of Defense that it had provided electrical, fire prevention, and other services called for in the contract, when in fact it had not provided those services.  Through these knowing false statements, DynCorp was able to secure payments under the contract of hundreds of millions of dollars.

2.      These *Qui Tam* claims arise under the provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730.

3.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a), which provides:  "Any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants any one defendant, can be found, resides, transacts business or in which any act proscribed by § 3729 occurred."  The defendants transact substantial business in the District of South Carolina and, on information and belief, have committed acts proscribed by § 3729 in the District of South Carolina

4.      Under the FCA, this Complaint was originally filed *in camera* and under seal.

## II.    <u>**PARTIES.**</u>

*5.*      *Qui tam* plaintiff James P. McGinnis is a citizen and resident of the state of Florida.   He brings this action on behalf of the United States.  He is a West Point graduate, and also earned a Masters Degree in Mechanical Engineering from Georgia Institute of Technology.  He served 25 years in the U.S. Army, retiring with the rank of Lieutenant Colonel.   He was a Distinguished Graduate of the Command and Staff School, Naval War College, commanded a 500-man nuclear-capable artillery battalion in Germany for two years, and served on the West Point faculty for three years.  He has

also served in various management positions in the U.S. defense industry, including a number of years at Northrop Grumman Corporation.  Most recently, he was a Deputy Project Manager and Liaison Officer Director with DynCorp International from March 23, 2010 to May 31, 2012, stationed at Bagram Airfield and Kandahar Airfield, Afghanistan. In that capacity, he became familiar with defendant DynCorp International's actions in performing (and failing to perform) under the LOGCAP IV contract.

6.      At all times relevant to this complaint, defendants DynCorp International Inc. and DynCorp International LLC (also referred to in this complaint collectively as "DynCorp International" or "DynCorp") operated as private military contractor with its corporate headquarters located in Fairfax County, Virginia.  DynCorp International Inc. is the corporate parent of DynCorp International LLC.  DynCorp receives more than $95% of its more than $3 billion in annual revenues from the U.S. Government. DynCorp also acted through various corporate subsidiaries and affiliates, which were controlled by DynCorp.  These subsidiaries and affiliates are included among the defendants in this action.

7.      As required under the False Claims Act, relator James P. McGinnis is providing to the Attorney General and the United States Attorney for South Carolina a Statement of All Material Evidence and Information related to the Complaint.  This disclosure statement supports the existence of false claims made by DynCorp, both directly and indirectly, for payment under its LOGCAP IV contract.  McGinnis is sometimes referred to herein as "the Relator."

8.      The Relator brings this action based on his direct knowledge and also on information and belief.  None of the actionable allegations set forth in this Complaint are

based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Relator is the original source of facts alleged in this Complaint, as he is privy to numerous representations, certifications, and statements DynCorp made to the Government during the course of its performance under its LOGCAP IV contract as well as internal information possessed by DynCorp showing that those representations, certifications, and statements were false and fraudulent.

## III. ALLEGATIONS

### A. Background regarding the LOGCAP IV Contract.

9. The Department of Defense established the LOGCAP program to provide civilian logistics support to U.S. military units, allowing those units to focus on their combat missions. The latest iteration of the program is known as LOGCAP IV. Under LOGCAP, the Department of Defense awarded contracts to three performance contractors, including DynCorp International. DynCorp's contract (Contract # W52P1J-07-D-0007) was awarded in April 2008 and includes one base year and several subsequent option years. The contract is potentially worth billions of dollars to DynCorp. Payments under the contract were made by the federal government from moneys drawn from the federal treasury.

10. On July 7, 2009, DynCorp was awarded Task Order 4 under LOGCAP IV to provide logistical support to dozens of United States military bases in southern Afghanistan. Under the contract, DynCorp is responsible for supporting existing bases and building new ones as needed, as well as providing base support services to each of covered bases. DynCorp is required to provide a variety of support services at the bases, including power generation and distribution, fire prevention and firefighting,

dining facilities, laundry services, recreation, water production, billeting management, sewage and waste management, and material handling equipment, as well as operations and maintenance of all these services.

11.     The LOGCAP IV contract requires DynCorp to provide information about its performance of its contractual obligations to the United States Government and its agencies, including the Department of Defense.  The Department of Defense reviews that information through its components, including the Defense Contract Management Agency (DCMA).   The Department of Defense relies on the accuracy of the information provided to it by DynCorp to determine whether to make payments under the contract, to make award payments under the contract for exceptional performance (i.e., to pay bonuses), to determine whether to exercise all or part of option years under the contract, to determine whether to seek a refund for work not performed under the contract, and to determine whether to ask for additional corrective work to be performed under the contract.

12.     DynCorp would report data to the Department of Defense in various ways, including both written and verbal communications as well as postings on secure internet websites.   Among various ways of providing information was a Contract Data Requirement List (CDRL), in which DynCorp would describe actions it had taken under the contract.  The Department of Defense relied on the accuracy of all of DynCorp's data to make the important decisions described in the previous paragraph.

13.     DynCorp was interested in receiving from the Department of Defense certain bonuses for exceptional performance under its LOGCAP IV contract.  To receive bonuses, DynCorp regularly made presentations to the Award Fee Evaluation Board

(AFEB) in which it described its activities under the contract.  The Department of Defense considered the extent to which DynCorp was fulfilling its contractual obligations in determining the size of the bonuses (if any) DynCorp would receive. Between 2010 and the date of the filing of this complaint, DynCorp received bonuses worth in excess of tens of millions of dollars by convincing the Department of Defense that it had achieved exemplary performance of its contractual obligations.

14.    The Department of Defense awarded contracts under LOGCAP  to three contractors – not only DynCorp, but also Fluor Corporation and KBR.  As a result, all three of the contractors could compete for future task orders and option years under the contract.  On information and belief, DynCorp was concerned that Fluor Corporation (which provided services to the Department of Defense in northern Afghanistan) wished to assume DynCorp's services with the Department of Defense in southern Afghanistan. Accordingly, to forestall that possibility, DynCorp wanted to convince the Department of Defense that its contractual performance was superior to what could be expected from Fluor.

### B.    Background on DynCorp's Electrical Services in Southern Afghanistan.

15.    As part of its LOGCAP IV contract and in exchange for payment of federal funds, DynCorp agreed to provide electrical and related services to various United States military bases in Afghanistan, including Kandahar, Leatherneck,  Tombstone, Dwyer, Sarkari Karez, Ramrod, Wolverine, Frontenanc, Spin Boldak, Lagman, Qalat, Camp Stone, Lawton, Herat, Victory, Shindand, Thomas, Tarin Kowt, Ripley, Delaram, Farah Garrison, Farah Airfield, Lindsey, Apache, Delaram II, Pasab, Howz-e-Madad**.** The electrical services included installation and maintenance of generators to provide

power as well as installation and maintenance of electrical distribution systems.  All electrical wiring in facilities maintained by DynCorp were required to be periodically inspected and maintained in accordance with contractually required electrical codes.

16.    Inadequate or faulty electrical inspections, maintenance or systems could pose a Life, Health, and Safety (LHS) hazard to American servicemen and servicewomen, i.e., could pose a risk of immediate injury, catastrophic equipment failure, or death if not mitigated.  Among DynCorp's responsibilities under LOGCAP IV was to respond quickly to LHS hazards.  To bring those hazards to DynCorp's attention, a reporting system was put in place in which customers (including servicemen and servicewomen) could make a Service Order Request (SOR) for electrical problems. Problems that posed a LHS hazard were required to be identified as an Emergency Service Order Request (ESOR). See Provision 05.02.02.a. of the Performance Work Statement which is attached to this Complaint as **Exhibit 1.** (See pages 1, 12, 49 and 50)   ESORs would sometimes be referred to by the shorter abbreviation of SORs.

17.    The Department of Defense, in order to confirm safe conditions for U.S. personnel and equipment, established a program of independent electrical inspections conducted by Teng Associates, a third party contractor reporting to U.S. Forces-Afghanistan and the Defense Contract Management Agency.  Reports of electrical LHS hazards found by Teng Associates came to be known as "flashes" or "flash reports".

18.    Despite DynCorp's repeated representation that it performance met or exceeded the contractual requirements, and dealing only with the critical LHS issues involving highly hazardous electrical issues, Teng Associates documented over 42,000

electrical hazards which presented an immediate danger to base occupants including US servicemen and servicewomen.

19.    In spite of DynCorp's contractual requirement to inspect and maintain facilities to electrical code, Teng inspectors found thousands of flash conditions in DynCorp-managed facilities in southern Afghanistan.  The flashes should have generated ESORs and corrective action by DynCorp.

20.    DynCorp was directed by the Government to track that data in a Weekly Flash Tracking Report.    DynCorp regularly provided these reports (and the data underlying these reports) to the Department of Defense and its personnel in various ways, including a Contract Data Requirement List (CDRL) A0087.  DynCorp also provided the substance of the information contained in these reports verbally to the Department of Defense and its personnel, and by emails and verbal summaries regarding important aspects of the reports.

21.    DynCorp provided these reports as part of its effort to cause the Government to pay out sums of money – specifically, payments under the LOGCAP IV contract.  DynCorp's purpose in submitting these reports was to get Department of Defense approval of its claims for payment under LOGCAP IV.  The Department of Defense considered the data in these reports when making payments to DynCorp under the LOGCAP IV contract, including both regular contract payments and bonus payments.  The Department of Defense also considered the data in these reports when making a determination of whether to seek a refund from DynCorp, or whether to ask for repairs and other works to be performed, and whether to exercise an option to extend the contract with DynCorp.

22.    A portion of a CDRL A0087 which DynCorp provided to the Department of Defense on or about November 15, 2010, is attached to this Complaint as **Exhibit 2.** Each complete CDRL A0087 is an Excel spreadsheet document which is hundreds or thousands of pages in length, reporting on DynCorp supported bases. DynCorp provided CDRL A0087s similar to Exhibit 2 to the Department of Defense on a weekly basis, beginning on or about November 2010.

### *C.  DynCorp's False Claims for Payment for Electrical Services*

23.    On and after July 7, 2009, DynCorp has knowingly presented to the United States – including specifically the Department of Defense (DOD) and its component the Defense Contract Management Agency (DCMA) – materially false and fraudulent claims for payment under its LOGCAP IV contract regarding electrical (and related) services. Specifically, DynCorp has made representations that it is entitled to payment under the contract for providing electric (and related) services, knowing full well that it had not provided all or even most of those electrical services.  DynCorp has also sought (and received) bonuses for exceptional performance under the contract, representing falsely that it has done an exemplary job in providing those services.

24.    Among the ways in which DynCorp has knowingly submitted false claims for payment is by sending weekly Flash Reports, i.e., CDRL A0087s, which deliberately undercounted the number of flashes at various bases, including for example the Leatherneck and Kandahar bases.  In addition, DynCorp sent Flash Reports showing that it had "completed" various electrical repairs when in fact DynCorp knew that it not completed all of those repairs.

25.    Among the ways in which DynCorp has knowingly submitted false claims for payment is by sending weekly Flash Reports, i.e., CDRL A0087s, purporting to comprehensively list all unresolved Emergency Service Order Requests or flashes, when in fact DynCorp intentionally omitted from the report a significant number of ESORs or flashes.

26.    Among the ways in which DynCorp has knowingly submitted false claims for payment is by making presentations to the Award Fee Evaluation Board (AFEB) in which it falsely and fraudulently claimed to have provided superior performance under the contract in providing electrical services.

27.    One specific example of DynCorp's false statements is found in the CDRL A0087 Electric Flash Report Weekly – RC – Southwest from March 31 - April 6, 2012. **Exhibit 3 is a portion of the DynCorp submitted CDRL.**  In that report is a specific listing of flashes from the Leatherneck base.  The report purports to show that the earliest flash occurred on January 17, 2011.  **(Exhibit 3 is the first page of the CDRL demonstrating the earliest flash reporting date is January 17, 2011).** In fact, as DynCorp well knew, a significant number of flashes had occurred earlier.  Indeed, in a "letter of concern" from DCMA to DynCorp dated January 7, 2011, DCMA noted that there were 1743 flashes up to January 7, 2011.  **Exhibit 4.**  These 1743 flashes were not included in the CDRL A0087 from March 31, 2012, in order to fraudulently make DynCorp's performance under the contract look better.

28.    Another specific example of a false statement is found in the CDRL A0087 Electric Flash Report Weekly – RC – South from May 19-25, 2012.  **Exhibit 5**.  In that report is a specific listing of flashes from the Kandahar base.  The report purports to

show that the total number of flashes there was 21,195.  In fact, as DynCorp well knew, a significant number of flashes were not included in that number.

29.    As another example, in a January 7, 2011, flash report it provided to the Department of Defense, DynCorp stated that 4555 flashes had occurred at Kandahar. Yet in a letter of concern from the DCMA to DynCorp, DCMA told DynCorp that there had been 7996 flashes at Kandahar through that same date.  DynCorp intentionally never worked to fully resolve the differences between these two numbers because it knew full well that the resolution would involve adding hundreds and hundreds of additional flashes to its report.  Each flash on the report showed a potential mistake by DynCorp in providing electrical services and accordingly had the potential to make DynCorp's performance under the contract look inadequate.  As stated above, each flash or ESOR represented a Life, Health, Safety (LHS) concern to American servicemen and servicewomen in the southern half of Afghanistan.

30.    DynCorp represented, in its submittal of CDRL A0087 as of May 5, 2012, that the number of open (unresolved) flashes was 1963. See **Exhibit 6 (CDRL A0087 Summary as of 5 May 2012). (The 1963 open flash figure is reached by adding the "open flash" number from each month since DynCorp first started reporting that there were unresolved flashes in December 2010.**  By comparison, a simultaneous Government investigation to determine the number of flashes that remained to be resolved as of May 2, 2012, found 6,766 flashes remaining on a sample of just 8,549 examined by Task 8 South.  The Government's number was based solely on a sample of 8,549 flashes – not the entire number of flashes.    **See Task 8 bar chart attached**

**as Exhibit 7.** DynCorp was fully aware of the discrepancy and knew that the Government's tabulation of flashes was more comprehensive and accurate.

31. Many other examples of the false statements described in the previous four paragraphs exist in other weekly reports and other DynCorp information it provided to the Department of Defense.

32. One of the reasons that DynCorp made these false statements was to keep Department of Defense personnel from filing a Corrective Action Request (CAR) with DynCorp. A CAR (particularly a Level 3 CAR having to do with LHS issues) would have attracted considerable attention within the DCMA and other high-level oversight (including, for example, the AFEB). By making false statements, DynCorp preventing CARs from being filed, and thereby improving its perceived performance on its contract.

33. The false claims and statements were material to the Department of Defense's decision to approve (or not approve) payments to DynCorp.

34. DynCorp personnel not only knowingly made false statements, but also acted in deliberate ignorance of the truth or falsity of the statements it was making and in reckless disregard of the truth or falsity of the statements.

35. In about December 2011, DynCorp received informal information from Teng Associates – the independent inspection contractor – that data being reported by DynCorp did not match the Teng database of flash reports. Shortly after that time, DynCorp received the complete Teng database of **42,826 flash reports** on bases that DynCorp was servicing. At that time, DynCorp was reporting weekly to the Government a total of approximately 31,000 flashes – a substantial undercount. DynCorp added roughly 5,000 flashes to its subsequent reports as a result of receiving the Teng

12

database to make it appear that it had duly considered the Teng information. However, DynCorp deliberately left off thousand flashes in order to make its contractual performance appear better than it was. Accordingly, all of DynCorp's subsequent reports knowingly involved undercounts of thousands of flashes.

36.    One of the reasons that DynCorp was undercounting the number of flashes in its reports was that at all times material to this Complaint it was significantly short-handed in its staff available in Afghanistan to respond to the flashes. DynCorp knew that it lacked sufficient staff to perform all of its electrical service obligations under LOGCAP IV. For example, in 2010 their staffing for electrical services was roughly 50% of what would have been required to perform DynCorp's obligations under the contract. By understaffing, DynCorp hoped to gain profits on the contract above those to which it was entitled.

37.    As an example of understaffing, at Kandahar in 2010, DynCorp had only three electricians servicing more than 3100 structures on a huge base.

38.    DynCorp's staffing was and is woefully inadequate. Various reports are available which demonstrate that for significant periods of time during the performance of the contract, DynCorp was staffed at or below 50 percent of the manpower required to perform the contract. For example, DynCorp's Personnel Summary Report dated April 13, 2010 reflects that although 7710 personnel were authorized, only 3527 personnel were actually onsite. **Exhibit 8.** Similarly, the same report in May 26, 2010 demonstrated that of the 8062 personnel authorized under the contract, only 3983 were actually onsite. **Exhibit 9**. DynCorp has remained understaffed throughout their performance of the contract.

13

39.    Staffing of the electrical requirements of the contract was woeful as well. As stated above, in 2010, there were only three (3) electricians servicing more than 3100 structures on the huge Kandahar base. As recently as November 2011, DynCorp was documenting that of the 531 electricians authorized under the contract, it had only 354 electricians in country. In other words, even in light of the long history of unaddressed LHS concerns regarding emergency electrical conditions which put American servicemen and servicewomen at risk, DynCorp was staffing electricians at only 2/3 of the mandated manpower level. See DynCorp's O&M Electrical Weekly Brief dated 01 Nov 2011 attached as **Exhibit 10.**

40.    Direct evidence that DynCorp was aware that it was undercounting thousands of flashes is found in internal emails among DynCorp's supervisory personnel, including some emails in the possession of the relator.

41.    An example of direct evidence of awareness of undercounting is a September 28, 2011, email states: "Our reports are not accurate.  They are missing thousands of Flashes from a year ago when not all Flashes were considered Emergency SORs."  The email continues: "Each time I see this report I cannot help thinking of the [DynCorp] phrase, 'We Do the Right Thing'.  I suggest it's time we do so in our Flash reporting."  **Exhibit 11.**   Despite this exhortation, DynCorp did not do "the right thing" and continued to under-report flashes to the Department of Defense. This email was sent to DynCorp's senior management, specifically Andrew Jasaitis, Chief of Staff at Kandahar; Jim DeLony, Project Manager for DynCorp overseeing all DynCorp operations in Afghanistan; Richard Hayes, Senior Director of Operations in Afghanistan;

Bradley Sprague, Director, Operations and Maintenance; and Drew Slaton, Director, Risk Management.

42.    Among the false statements that DynCorp made was a PowerPoint response to an inquiry originating from the office of Senator Bob Casey from Pennsylvania.  Senator Casey's Office asked DynCorp what LOGCAP contractors in Afghanistan were doing to ensure electrical safety of American troops.  In response, DynCorp prepared a three-slide PowerPoint presentation dated 22 November 2011.  That presentation stated that DynCorp had identified 31,504 flashes and completed responses to 28,890 "for a 92% completion rate."  **Exhibit 12**.  Yet, as DynCorp well knew, there were thousands of other flashes not counted, and therefore the 92% completion rate was inaccurate and highly misleading.

43.    Another example of direct evidence of awareness of undercounting comes from a May 28, 2012 e-mail, which states: "Our CDRL A0087 Electrical Flash Report, summarized below, says we have 1,750 open flashes.  The TF Power DCMA Task 8 South chart sent out today (attached) says, as I interpret it, that we have 6,766 Flash SORs open [--] i.e., not closed."  **Exhibit 13.**  This email was sent to Bradley Sprague, Director, Operations and Maintenance; Paul Craig, Master Electrician; James Piefer, Electrical Team Lead; Donald Chapman, Electrical Analyst; Jim DeLony, Project Manager and Andrew Jasaitis, Chief of Staff.

44.    Additional direct evidence that DynCorp was aware of its undercounting and other false statements can be found by comparing DynCorp's external submissions of information to the Department of Defense with its internal collection of information.  DynCorp had internal documents, including Quality Assurance Requests (QARs) and

Quality Assurance Plans (QAPs). The data in those documents did not match the data that DynCorp was submitting to the Department of Defense.

45.    DynCorp was also aware that many of the electrical services it claimed to have performed had not in fact been performed. It knowingly sought to conceal this from the Department of Defense in order to avoid having to perform repair work or to refund money to the Department of Defense. Because of its failure to staff the contract properly DynCorp faced a self-inflicted impossible situation at Kandahar when it was faced with the circumstance of having 5000 flashes and three electricians to respond to those 5000 flashes. (Documentation of the electrical personnel assigned to Kandahar is in the possession of DynCorp.

46.    Rather than properly staff Kandahar and other bases with electricians who could address the dangerous conditions, DynCorp chose to downgrade the flashes from Emergency (which require a response/repair within 2 hours, to Urgent (which requires a response/repair within 72 hours) or Routine (which are not required to be addressed for 14 days). The other step taken, much more serious in its safety implications, was to falsely report flashes as "Completed" when in fact they were not. This resulted in hundreds of LHS hazards not being repaired, while false reports stated they were. See Provision 05.02.02.a. of the Performance Work Statement which is attached to this Complaint as **Exhibit 1** (See pages 1, 12, 49 and 50).

47.    In 2011 DCMA initiated a program to re-inspect the flashes reported as Completed. This is the contractual task for Teng Associates, the independent inspector, known as Task 8. The Teng flash reports are normally single-page .pdf documents, but are very comprehensive. Examples are shown in **Exhibit 14**. They not only describe the

fault, but quote the relevant Code reference and show a color photo of the hazardous condition. (The quality of the Exhibit is degraded from the original due to copying and scanning. Originals of Teng's documentation can be obtained from Teng, DynCorp, or DCMA.)

48.    DynCorp's practice of falsely reporting Complete flash status was revealed during the Task 8 re-inspection process. In September 2011, The DCMA -South Commander, LTC Lance Green, visited Jim DeLony, the DynCorp Project Manager and confronted him with evidence of DynCorp's false reporting. He carried with him several Teng flash reports, both the original and those made during the re-inspection. In the handful of cases he presented, the photos were identical. The original showed the hazardous fault and the re-inspection photo was identical. In every case the fault had been reported as Complete, or repaired, when in fact they had not been touched.

49.    Had LTC Green, DCMA or DOD known that reporting of Flashes as complete when they had not been touched was a systemic situation rather than an aberration, DynCorp would have faced serious contractual penalties and perhaps termination, as a result of these unconscionable violations of integrity and the accompanying risk to US personnel.

50.    Thereafter, DynCorp instituted, at US Government expense, a Flash Recovery program of re-inspection of all "Completed" flashes to confirm satisfactory repair. This program is ongoing and has generally documented a failure rate between 8 and 9 percent among the more than 30,000 flashes re-inspected. This suggests that in approximately 2700 cases, DynCorp falsely reported Completed repairs when in fact the repairs were not Completed. That is 2700 uncorrected LHS issues which posed a threat

to American servicemen and woman, which DynCorp falsely and fraudulently reported as complete.

51.     DynCorp's false claims of Completion of flashes, submitted in every submittal of CDRL A0087 Flash Report Weekly, was relied upon by the US Government in its decision to make payments to DynCorp and to retain DynCorp for follow-on option year contract awards.

52.     On information and belief, DynCorp is continuing to submit false claims for payment as described in the preceding paragraphs of this section of the complaint and intends to do so for the foreseeable future.

### D.     Background on DynCorp's Fire Prevention Services in Southern Afghanistan.

53.     As part of its LOGCAP IV contract and in exchange for payment of federal funds, DynCorp agreed to provide fire prevention and inspection services and training for various United States military bases in Afghanistan, including Kandahar, Leatherneck, Tombstone, Dwyer, Sarkari Karez, Ramrod, Wolverine, Frontenanc, Spin Boldak, Lagman, Qalat, Camp Stone, Lawton, Shindand, Tarin Kowt, Ripley, Delaram, Farah Garrison, Farah Airfield, Lindsey, Apache, Delaram II, Pasab, Howz-e-Madad**.** Under its contract, DynCorp was required to conduct fire inspections, provide fire extinguishers, smoke detectors, carbon monoxide detectors and lighted exit signs. Under its contract, DynCorp was further required to perform base wide fire inspections and reports of those base wide inspections as required.  DynCorp was also required to develop pre-incident fire plans and develop risk assessments.  See Provision 05.17.02-Fire Protection Services of the Performance Work Statement which is attached to this Complaint as **Exhibit 1** (See pages 1, 24, and 65).

54.     DynCorp's supervisory personnel were aware of all the contractual requirements described in the previous paragraph.

55.     Inadequate performance by DynCorp of its fire prevention services could pose an immediate risk of injury, catastrophic equipment failure, or death if not mitigated.  DynCorp was contractually required to develop pre-incident fire plans and risk assessments throughout base camps, facilities, and tents, and provide fire inspection reports.  DynCorp was also required to conduct semi-annual fire inspections. See **Exhibit 1** (See pages 1, 24, and 65).

56.     DynCorp generated periodic reports to the Department of Defense regarding its fire prevention services.    On information and belief, these reports are found in the form of a Contract Data Requirement List (CDRL).  DynCorp also provided the substance of the information in other ways to the Department of Defense and its personnel, including verbal summaries and e-mails of important aspects of the reports.

57.     DynCorp provided the information described in the preceding paragraph as part of its effort to cause the Government to pay out sums of money – specifically, payments under the LOGCAP IV contract.  DynCorp's purpose in submitting these reports was to get its claims for payment under LOGCAP IV approved.  The Department of Defense considered the data in these reports when making payments to DynCorp under the LOGCAP IV contract, including both regular contract payments and bonus payments.  The Department of Defense also considered the data in these reports when making a determination of whether to seek a refund from DynCorp, whether to ask DynCorp to repair or re-perform work already done, and whether to exercise an option to extend the contract with DynCorp.

### *E.  DynCorp's False Claims for Payment for Fire Prevention Services*

58.    On and after July 7, 2009, DynCorp has knowingly presented to the United States – including specifically the Department of Defense and its component the Defense Contract Management Agency – materially false and fraudulent claims for payment under its LOGCAP IV contract regarding fire prevention services. Specifically, DynCorp has made representations that it is entitled to payment under the contract for providing fire prevention services, knowing full well that it had not provided all of those fire prevention services.  DynCorp has also sought (and received) bonuses for exceptional performance under the contract, representing falsely that it has done an exemplary job in providing those services.

59.    Among the ways in which DynCorp has knowingly submitted false claims for payment is by sending weekly CDRL showing that it had performed various fire prevention services (including, for example, fire inspections) when in fact it had not provided those services.  DynCorp's senior management was fully aware that it was not meeting its contractual obligations regarding fire prevention services and that it was falsely representing otherwise.

60.    As an example of DynCorp's awareness of its failure to perform its contractual obligations, an e-mail chain sent to DynCorp's senior management team in Afghanistan on or about January 5, 2012, stated:

> Please note that according Ms Foley [a governmental contracts administrator at Rock Island], "For fire inspects I read the PWS as saying [DynCorp is] responsible to perform base wide inspections so I would interpret that to mean all facilities." (highlighted below)
>
> To date we have not done fire inspections on facilities outside the MSOW [Master Schedule of Work There are currently 19,300 facilities (31 million square feet) on the MSOW.  This direction now places over 66,000 facilities (140 million

square feet) on the fire inspection density.  See the attached additional personnel and equipment requirements to perform this mission.  This is an increase of 343% in facilities, and 443% in floor space.

We will prepare the CRF (internal Change Request Form) to hire the correct number of fire inspectors to accomplish this PWS task.  We currently estimate, per the attachment using the listed measures and justifications, an additional annual cost of $29.7 in personal and equipment costs.

**Exhibit 15.**

61.    As an example of one of many false claims DynCorp submitted for fire prevention services, on February 23, 2012, DynCorp made a presentation to the Award Fee Evaluation Board in an effort to obtain a bonus.  As part of that presentation, DynCorp submitted to the Board a set of Powerpoint slides.  *See* **Exhibit 16**.  On page 16 of that presentation, DynCorp represented that its performance level for "semi-annual fire inspections" was "99%."  In fact, as Dyncorp well knew, its performance level was significantly below that level because it was DynCorp's practice to only inspect certain buildings within its service areas, rather than the basewide inspections that the contract required.  Indeed, measured on a basewide basis, its performance was in the neighborhood of only 20%.  DynCorp knew full well that it was performing only a small percentage of its contractually required inspections at the time it was seeking a bonus for purportedly completing 99% of those inspections.  DynCorp also knew full well that no one else was performing those inspections and that its failure to perform those inspections placed the safety of servicemen and servicewomen at risk.

62.    Comparing the representations made to the Award Fee Evaluation Board on February 23, 2012, that it was 99% compliant in its performance of fire inspections, with the earlier email discussion of January 5, 2012 that a small fraction of the facilities

DynCorp was supposed to be inspecting actually were being inspected, reveals the knowing, intentional and fraudulent nature of the misrepresentation made by DynCorp.

63.    As a further example of DynCorp's awareness of its failures, on or about March 5, 2012, Jeff Cahill sent an email to Patrick Dobson, Julio Maldonado, Abdur-Raheem As-Siddiq, Jim Bond, Jim DeLony, Michael Lindseth, Brook Dozier, Paul Ham, Skip Kelly, Senior Director of Contracts (Fort Worth); Jeff Johnson, Director of Contracts (Fort Worth); Andrew Jasaitis, Chief of Staff (Kandahar); Richard Hayes, Senior Director of Operations (Afghanistan); Matthew Mckinney, and James McGinnis, in which he stated:

> As Pat Dobson states below this [obligation to perform base wide fire inspections] is not a change to our PWS requirement as it clearly states that we "shall perform base wide fire inspections".  This is something we do not need an LOTD for and we should be performing this service now. Understand that there are additional resources required to perform these inspections but we cannot tell the USG [U.S. Government] that we need something from them before we can perform this requirement.

> **Exhibit 17.**  (LTOD is a Letter of Technical Direction which is issued by DCMA when it wishes to turn on performance of various aspects of a contract.)

64.    DynCorp did not want to spend the money to obtain the "additional resources" to fulfill its contract obligations.  To avoid providing $29.7 million in fire prevention services to the Department of Defense -- DynCorp did not hire the necessary number of fire inspectors.

65.    One of the reasons that DynCorp was not performing all of its inspections was that at all times material to this Complaint it was significantly short-handed in its staff available in Afghanistan to do those inspections and the other functions it was required to perform under the contract.

66.     DynCorp's staffing was woefully inadequate.  Various reports are available which demonstrate that for significant periods of time during the performance of the contract, DynCorp was staffed at or below 50 percent of the manpower required to perform the contract. For example, DynCorp's Personnel Summary Report dated April 13, 2010 reflects that although 7710 personnel were authorized, only 3527 personnel were actually onsite.  **Exhibit 8.** Similarly, the same report in May 26, 2010 demonstrated that of the 8062 personnel authorized under the contract, only 3983 were actually onsite. **Exhibit 9**. DynCorp has remained understaffed throughout their performance of the contract.

67.     DynCorp knew that it lacked sufficient staff to perform all of its fire prevention obligations under LOGCAP IV.     For example, it knew that it was understaffed to the tune of $29.7 million for 112 fire inspectors and related fire prevention equipment.     Suddenly billing that amount to the USG, however, would reveal DynCorp's failure to perform, may put this year's Period of Performance in an overrun condition, and will subject DynCorp to justifiable allegations of mismanagement and false reporting.

68.     In spite of broad internal knowledge of DynCorp's failure to perform required Fire Prevention Inspections, DynCorp falsely reported to the US Government "Semi-annual Fire Inspections – 100%" in a Program Evaluation Board presentation for HUB Kandahar on 16 April 2012. (Page 20, **Exhibit 18**)  The US Government relied on this information in its decisions to make payments to DynCorp and to continue to award follow-on option contracts to DynCorp.

69.     One of the reasons that DynCorp made these false claims and statements was to keep Department of Defense personnel from filing a Corrective Action Request (CAR) with DynCorp.  A CAR (particularly a Level 3 CAR having to do with LHS issues) would have attracted considerable attention within the DCMA and other high-level oversight (including, for example, the AFEB).  By making false statements, DynCorp preventing CARs from being filed, and thereby improving its perceived performance on its contract.

70.     The false claims and statements were material to the Department of Defense's decision to approve (or not approve) payments to DynCorp.

71.     DynCorp personnel not only knowingly made false statements, but also acted in deliberate ignorance of the truth or falsity of the statements it was making and in reckless disregard of the truth or falsity of the statements.  Many of these false, fraudulent and reckless misrepresentations involve LHS issues which put the lives of American servicemen and servicewomen at risk.

72.     On information and belief, DynCorp is continuing to submit false claims for payment as described in the preceding paragraphs of this section of the complaint and intends to do so for the foreseeable future.

### F.  Fire at Camp Commando From DynCorp's Inadequate Fire Prevention Services.

73.     One of the sites on which DynCorp International (DI) was required to perform Fire Prevention Services is Forward Operating Base (FOB) Lawton.  There is a sub-base adjacent to FOB Lawton, known as Camp Commando.  In 2011, Camp Commando was occupied by elite U.S. Marine Special Operations Forces who were actively involved in important combat operations in Afghanistan.  DynCorp was required

to provide (and did provide) LOGCAP IV services to Camp Commando, including (for example) food service, recreation service, and fire prevention service.

74.    Tragically, on the morning of July 31, 2011 a fire broke out in Camp Commando.   Three Marines and a working dog died in the fire.   Subsequent investigations revealed that there was an insufficient number of smoke detectors/alarms and fire extinguishers in the facility.   Some doors were barred and locked from the outside, preventing the Marines from escaping.   There were also no lighted exit signs to direct the Marines to safety.   The fire was determined to have been started by a non-certified electrical power transformer in one of the quarters.

75.    Once the fire started, there were several attempts by support personnel to rescue the Marines.   When the ammunition began exploding, however, rescue attempts were curtailed, and it may have already been too late.

76.    With regard to the fire, DynCorp did not provide the required number of smoke detectors, alarms, and fire extinguishers.   A service member at Camp Commando attempted to contact the DynCorp Site Manager about these issues three days before the fire, but could not get an answer on the phone, nor an answer to a knock on the door.

77.    Following the fire, DynCorp knowingly made false statements to the Department of Defense, claiming no responsibility for the fire and the tragic deaths it produced.   For example, DynCorp told the Department of Defense that it had no responsibility for anything at Camp Commando, because no facilities there were on the "Density List" or Master Schedule of Work (MSOW).   Yet as DynCorp well knew, the MSOW in effect at the time of the fire plainly showed that DynCorp was performing

scheduled services on two generators in Camp Commando.  It is thus clear that Camp Commando was receiving LOGCAP IV services from DynCorp as part of the site known as Lawton.  Thus, as DynCorp knew, Camp Commando was in fact included in contractually-required "base-wide fire inspections."  DynCorp, however, had failed to provide its contractually-required fire prevention services at Camp Commando [Lawton] before the fire took place.  **Exhibit 19** is the DynCorp Changes Matrix showing Fire Prevention Services required at Lawton. (see line 78 of Exhibit 19) The Master Schedule of Work shows daily LOGCAP maintenance services and weekly LOGCAP refueling for generators at Camp Commando.  **Exhibit 20. (see line 123)**

78.    DynCorp's knowing false statements about its lack of responsibility for Camp Commando were made as part of its effort to cause the Government to pay out sums of money – specifically, payments under the LOGCAP IV contract.  DynCorp's purpose in submitting these reports was to get its claims for payment under LOGCAP IV approved.  The Department of Defense considered DynCorp's statements when making payments to DynCorp under the LOGCAP IV contract, including both regular contract payments and bonus payments.  The Department of Defense also considered the data in these reports when making a determination of whether to seek a refund from DynCorp and whether to exercise an option to extend the contract with DynCorp.

79.    If DynCorp had properly provided its contractually-required fire prevention service at Camp Commando, it would have complied with Army Regulation 420-1 and DA Form 5381.  A copy of DA Form 5381 is attached to this Complaint as **Exhibit 21.**  If that checklist had been followed, it would have identified, before the fire, problems that

later lead to the death of the three Marines.  If the Unit Commander had implemented corrections to fix these problems, the three Marines would not have died.

### G.  DynCorp's False Claims for Payment for Other Services

80.    On information and belief and in light of the systemic nature of the false claims and underperformance of the contract regarding essential electrical and fire services, on and after July 7, 2009, DynCorp has knowingly presented (and caused to be presented) to the United States – including specifically the Department of Defense and its component the Defense Contract Management Agency – false and fraudulent claims for payment under its LOGCAP IV contract in Afghanistan regarding other services under the contract, including dining, laundry, morale and recreation, water production, billeting management, sewage and waste management, and material handling equipment services, as well as operations and maintenance of all these services.    DynCorp has also sought (and received) bonuses for exceptional performance under the contract, representing falsely and fraudulently that it has done an exemplary job in providing those services.

81.    Significant information regarding the false and fraudulent claims that DynCorp   presented to the Department of Defense lies peculiarly within the possession and control of DynCorp, including information found in e-mails and other forms of electronic communication.

82.    On information and belief, among the ways in which DynCorp knowingly made false and fraudulent claims for payment under the contract was through listing services provided  by so-called "ghost personnel" -- i.e., personnel who had not actually provided services to the Defense Department.  For example, DynCorp would seek

27

reimbursement for expenses for personnel who not located in Afghanistan, even though such reimbursement was not authorized by the contract.

## COUNT 1
## FALSE CLAIMS REGARDING ELECTRICAL SERVICES TO RECEIVE CONTRACT PAYMENTS

83.     Relator repeats and realleges paragraphs 1 through 52 of this Complaint.

84.     From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for electrical services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

85.     Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payments for electrical services. Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

86.     The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to make payments for electrical services under its contract with DynCorp that they would not otherwise have paid.

87.     The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims for electrical services under the contract, as well as for the time and energy spent reviewing those claims.

## COUNT 2
## FALSE CLAIMS REGARDING ELECTRICAL SERVICES TO RECEIVE BONUS PAYMENTS

88.     Relator repeats and realleges paragraphs 1 through 52 of this Complaint.

89.     From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for bonuses for electrical services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

90.     Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV bonus payments for electrical services. Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

91.     The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to pay bonuses for electrical services that they would not otherwise have paid.

92.     The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims under the contract for electrical services, as well as for the time and energy spent reviewing those claims.

## COUNT 3
## FALSE CLAIMS REGARDING FIRE PREVENTION SERVICES TO RECEIVE CONTRACT PAYMENTS

93.     Relator repeats and realleges paragraphs 1 through 14 and 53 through 79 of this Complaint.

94.     From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for fire prevention services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

95.     Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payment for fire prevention. Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

96.     The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to make payments for fire prevention services under its contract with DynCorp that they would not otherwise have paid.

97.     The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims for fire prevention services under the contract, as well as for the time and energy spent reviewing those claims.

### COUNT 4
### FALSE CLAIMS REGARDING FIRE PREVENTION SERVICES TO RECEIVE BONUS PAYMENTS

98.     Relator repeats and realleges paragraphs 1 through 14 and 53 through 79 of this Complaint.

99.     From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for

bonuses for fire prevention services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

100.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payments for fire prevention services.  Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

101.    The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to pay bonuses for fire prevention services that they would not otherwise have paid.

102.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims under the contract for fire prevention services, as well as for the time and energy spent reviewing those claims.

### COUNT 5
### FALSE CLAIMS REGARDING THE  JULY 31, 2011 FIRE TO RECEIVE CONTRACT PAYMENTS

103.    Relator repeats and realleges paragraphs 1 through 14 and 53 through 79 of this Complaint.

104.    From about on July 31, 2011 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims regarding the July 31, 2011 fire in order to have claims paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

105.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain payments by fraudulently denying responsibility for the

31

fire.   Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

106.    The United States and its fiscal intermediaries were unaware of the defendants' false statements regarding the July 31, 2011 fire and as a result have paid and continue to make payments under its contract with DynCorp that they would not otherwise have paid.

107.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims, as well as for the time and energy spent reviewing those claims.

**COUNT 6**
**FALSE CLAIMS REGARDING THE JULY 31, 2011 FIRE TO RECEIVE BONUS PAYMENTS**

108.    Relator repeats and realleges paragraphs 1 through 14 and 53 through 79 of this Complaint.

109.    From about on July 31, 2011 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims regarding the July 31, 2011 fire in order to have bonuses paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

110.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain bonus payments by fraudulently denying responsibility for the fire.   Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

111.    The United States and its fiscal intermediaries were unaware of the defendants' false statements regarding the July 31, 2011 fire and as a result have paid and continue to make bonus payments under its contract with DynCorp that they would not otherwise have paid

112.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent bonus claims, as well as for the time and energy spent reviewing those claims.

### COUNT 7
### FALSE CLAIMS REGARDING OTHER SERVICES TO RECEIVE CONTRACT PAYMENTS

113.    Relator repeats and realleges paragraphs 1 through 112 of this Complaint.

114.    From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for other services (apart from electric services and fire prevention services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

115.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payment for these other services.  Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

116.    The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to make payments

for these other services under its contract with DynCorp that they would not otherwise have paid.

117.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims for the other services under the contract, as well as for the time and energy spent reviewing those claims.

## COUNT 8
## FALSE CLAIMS REGARDING OTHER SERVICES TO RECEIVE BONUS PAYMENTS

118.    Relator repeats and realleges paragraphs 1 through 112 of this Complaint.

119.    From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for bonuses for other services (apart from electrical and fire prevention services) under the LOGCAP IV contract to be paid (or approved for payment) by the United States, in violation of 31 U.S.C. § 3729(a)(1).

120.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payments for these other prevention services.  Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

121.    The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have paid and continue to pay bonuses for these other services that they would not otherwise have paid.

122.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims under the contract for these other services, as well as for the time and energy spent reviewing those claims.

## COUNTS 9 – 97
## FALSE CLAIMS IN CDRL A0087S TO RECEIVE CONTRACT PAYMENTS FOR ELECTRICAL SERVICES

123.    Relator repeats and realleges paragraphs 1 through 52 and 84 through 92, of this Complaint.

124.    From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly presented (and caused to be presented) false and fraudulent claims for electrical services under the LOGCAP IV contract to be paid (or approved for payment) by the United States, providing false information about the number of flashes on the bases for which it was providing electrical services and its responses to those flashes, in violation of 31 U.S.C. § 3729(a)(1).   The false claims were contained a form known as a Contract Data Requirement List (CDRL) A0087, submitted on the date listed in the table below for each count listed below.

| 9 | November 15, 2010 |
|---|---|
| 10 | November 22, 2010 |
| 11 | November 29, 2010 |
| 12 | December 6, 2010 |
| 13 | December 13, 2010 |
| 14 | December 20, 2010 |
| 15 | December 27, 2010 |
| 16 | January 3, 2011 |
| 17 | January 10, 2011 |
| 18 | January 17, 2011 |
| 19 | January 24, 2011 |
| 20 | January 31, 2011 |
| 21 | February 7, 2011 |
| 22 | February 14, 2011 |
| 23 | February 21, 2011 |
| 24 | February 28, 2011 |
| 25 | March 7, 2011 |
| 26 | March 14, 2011 |
| 27 | March 21, 2011 |
| 28 | March 28, 2011 |
| 29 | April 4, 2011 |
| 30 | April 11, 2011 |
| 31 | April 18, 2011 |
| 32 | April 25, 2011 |
| 33 | May 2, 2011 |
| 34 | May 9, 2011 |
| 35 | May 16, 2011 |
| 36 | May 23, 2011 |
| 37 | May 30, 2011 |
| 38 | June 6, 2011 |
| 39 | June 13, 2011 |
| 40 | June 20 2011 |
| 41 | June 27, 2011 |
| 42 | July 4, 2011 |
| 43 | July 11, 2011 |
| 44 | July 18, 2011 |
| 45 | July 25, 2011 |
| 46 | August 1, 2011 |
| 47 | August 8, 2011 |
| 48 | August 15, 2011 |
| 49 | August 22, 2011 |
| 50 | August 29, 2011 |
| 51 | September 5, 2011 |
| 52 | September 12, 2011 |
| 53 | September 19, 2011 |

| 54 | September 26, 2011 |
| 55 | October 2, 2011 |
| 56 | October 9, 2011 |
| 57 | October 16, 2011 |
| 58 | October 23, 2011 |
| 59 | October 30, 2011 |
| 60 | November 6, 2011 |
| 61 | November 13, 2011 |
| 62 | November 20, 2011 |
| 63 | November 27, 2011 |
| 64 | December 4, 2011 |
| 65 | December 11, 2011 |
| 66 | December 18, 2011 |
| 67 | December 25, 2011 |
| 68 | January 1, 2012 |
| 69 | January 8, 2012 |
| 70 | January 15, 2012 |
| 71 | January 22, 2012 |
| 72 | January 29, 2012 |
| 73 | February 5, 2012 |
| 74 | February 12, 2012 |
| 75 | February 19, 2012 |
| 76 | February 26, 2012 |
| 77 | March 4, 2012 |
| 78 | March 11, 2012 |
| 79 | March 18, 2012 |
| 80 | March 25, 2012 |
| 81 | April 1, 2012 |
| 82 | April 8, 2012 |
| 83 | April 15 2012 |
| 84 | April 22, 2012 |
| 85 | April 29, 2012 |
| 86 | May 6, 2012 |
| 87 | May 13, 2012 |
| 88 | May 20, 2012 |
| 89 | May 27, 2012 |
| 90 | May 28, 2012 |
| 91 | June 4, 2012 |
| 92 | June 11, 2012 |
| 93 | June 18, 2012 |
| 94 | June 25, 2012 |
| 95 | July 1, 2012 |
| 96 | July 8, 2012 |
| 97 | July 15, 2012 |

125.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to obtain LOGCAP IV contract payments for fire prevention by submitting false CDRL A0087s on the dates indicated in the table above.    Relator specifically alleges, therefore, that the False Claims Act violations are continuing and will continue each week, for which the U.S. Treasury should be made whole.

126.    The United States and its fiscal intermediaries were unaware of the defendants' false statements in the CDRL A0087s and as a result have paid and continue to make payments for fire prevention services under its contract with DynCorp that they would not otherwise have paid.

127.    The United States has been and continues to be damaged by the payment to DynCorp of these false and fraudulent claims for electrical services under the contract, as well as for the time and energy spent reviewing those claims.

### COUNT 98
### REVERSE FALSE CLAIMS REGARDING ELECTRICAL  SERVICES PERFORMED TO AVOID REFUNDS OR PERFORMING REPAIRS

128.    Relator repeats and realleges paragraphs 1 through 52 and 84 through 92, of this Complaint.

129.    From about on July 7, 2009 through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International LLC knowingly made and used, and caused to made and used, a false record or statement material to an obligation to pay or transmit money and property to the Department of Defense, and also knowingly concealed and knowingly and improperly decreased an obligation to pay and transmit money and property to the Department of Defense, by concealing the number of flashes at military bases where it was providing

electrical services in Afghanistan and by concealing its response to those flashes (including which flashes remained "open" or in need of attention and the number of flashes for which repairs were not adequate),  in violation of 31 U.S.C. § 3729(a)(7).

130.    By knowingly concealing the number of open flashes from the Department of Defense as well as the number of flashes for which repairs were inadequate, DynCorp concealed the need for it to provide repair work or other corrective service for those flashes and/or to refund money to the Department of Defense for payments made for work that DynCorp had not performed or had not performed properly.

131.    Relator has not seen any indication that the defendants intend to change their fraudulent scheme to knowingly conceal from the Department of Defense the number of open flashes for which repairs are needed.  Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

132.    The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have not been aware of DynCorp's obligation to provide repairs and/or refunds for electrical work not performed or inadequately performed.  The United States has therefore been damaged.

### COUNT 99
### REVERSE FALSE CLAIMS REGARDING FIRE INSPECTORS TO AVOID HIRING FIRE INSPECTORS

133.    Relator repeats and realleges paragraphs 1 through 14 and 53 though 82 and 93 through 112 of this Complaint.

134.    From about on January 5, 2012, through the date of this Complaint (and continuing thereafter), defendants DynCorp International Inc. and DynCorp International

LLC knowingly made and used, and caused to made and used, a false record or statement material to an obligation to pay or transmit money and property to the Department of Defense, and also knowingly concealed and knowingly and improperly decreased an obligation to pay and transmit money and property to the Department of Defense, by concealing the extent of its fire inspections and by concealing that it was not performing base-wide fire inspections, in violation of 31 U.S.C. § 3729(a)(7).

135.   By knowingly concealing that it lacked the required number of fire inspectors to perform base-wide fire inspections in its area of service, DynCorp concealed the need for it to spend $29.7 million in additional fire inspection and related services for the Department of Defense.

136.   Relator has not seen any indication that the defendants intend to change their fraudulent scheme to knowingly conceal from the Department of Defense the number of fire inspections that have not been performed and the number of new fire inspectors who would be needed to perform those inspections.  Relator specifically alleges, therefore, that the False Claims Act violations are continuing, for which the U.S. Treasury should be made whole.

137.   The United States and its fiscal intermediaries were unaware of the defendants' false statements and as a result have not been aware of DynCorp's obligation to provide fire inspections that have not been performed or have been inadequately performed.  The United States has therefore been damaged.

WHEREFORE, on all counts, Relator respectfully requests that this Court to award the following damages to the following parties and against all defendants:

To the United States:

    (1)    Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which the Defendants caused to be presented to the United States;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relator:

    (1)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorney's fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## Jury Demand

    Plaintiff/Relator, for himself and the United States, demands a jury trial on all counts.

DATED:  August  2, 2012

Respectfully Submitted,
*s/Robert G. Rikard*
Robert Rikard (Fed ID# 6938)
**Rikard & Protopapas LLC**
1329 Blanding Street
Columbia, South Carolina 29201
Telephone (803) 978-6111
Facsimile (803) 978-6112
E-mail: rgr@rplegalgroup.com

*and*

Matthew D. Weissing
Florida Bar No.: 559792
*Motion for Admission Pro Hac Vice Pending*
**FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.**
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
E-mail: matt@pathtojustice.com

*and*

Paul G. Cassell
*Motion for Admission Pro Hac Vice Pending*
4412 S. Jupiter Dr.
Salt Lake City, UT 84124
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

*And*

Peter Mougey
*Motion for Admission Pro Hac Vice Pending*
James Kauffman
*Motion for Admission Pro Hac Vice Pending*
**Levin Papantonio, et. al.**
316 South Baylen Street
Suite 600
P.O. Box 12308
Pensacola, FL  32502
Telephone:  850-435-7000
Facsimile:  850-435-7020
pmougey@levinlaw.com
jkauffman@levinlaw.com